**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Ansumana S.,

Petitioner,

v.

Todd Blanche, et al.,

Respondents.

No. 26-cv-3371 (KMM/DJF)

**ORDER**

---

This matter is before the Court on Petitioner Ansumana S.'s ("Petitioner" or "Mr. S") Petition for a writ of habeas corpus. Pet., Dkt. 1.[1] Mr. S seeks immediate release from ICE custody and an order enjoining Respondents from removing him from the United States to a "third country" until Respondents take affirmative steps to reopen his removal proceedings so that his fear-based claims may be heard in reopened proceedings. Pet., Prayer for Relief ¶¶ 3, 5.

## I. BACKGROUND

### A. Petitioner's Entry to the United States and Removal Order

Mr. S is a citizen of the Ivory Coast who has resided in the United States for more than 20 years. He entered the United States in June 2004 near New York. At the time of his

[1] On July 27, 2026, Petitioner filed a motion for a temporary restraining order ("TRO"). TRO Mot., Dkt. 12. Subsequently, the parties agreed to a briefing schedule, which was adopted by the Court, in which Respondents agreed to provide a combined response to the habeas petition and the TRO motion. Dkt. 10; Dkt. 11. Based on the parties' agreement and the briefing submitted, the Court considers the TRO motion and the merits of the petition's claims to have merged, and, therefore, finds the TRO motion to be moot.

recent arrest by immigration authorities, he resided in Brooklyn Park, Minnesota. He has four children who are United States citizens, has worked in the United States, filed taxes, and remained law abiding since June 2004.

In February 2005, immigration authorities charged that Mr. S was subject to removal from the United States by issuing him a notice to appear ("NTA") before an immigration judge ("IJ"). NTA at 1, Dkt. 16-1 (stating Petitioner is charged with being subject to removal under 8 U.S.C. § 1227(a)(1)(A) because "at the time of entry" he did not possess a valid unexpired immigrant visa, reentry permit, border crossing identification card or other valid entry document). On October 6, 2006, an IJ ordered Mr. S removed from the United States to "any country other than the Ivory Coast that will accept him." Removal Order at 1, Dkt. 16-2. The IJ granted Mr. S's request for withholding of removal to the Ivory Coast. *Id.* On October 17, 2006, Immigration and Customs Enforcement ("ICE") issued a Form I-205 Warrant of Removal/Deportation commanding immigration officers to take Mr. S into custody based on the IJ's removal order. Oct. 2006 I-205, Dkt. 16-7.

**B. Petitioner's Order of Supervision, Revocation, and Recent Arrest**

What occurred between the October 2006 removal order and March 2010 is not clear from the record. On March 15, 2010, ICE issued an Order of Supervision ("OSUP")

allowing Mr. S "to be at large under [specified] conditions" of release.[2] OSUP at 1, Dkt. 16-3. Over the next several years, Mr. S appears to have regularly checked in with immigration officials. *See* OSUP at 2. There is no evidence that he failed to comply with the conditions of release in the OSUP.

On July 16, 2026, Mr. S received a phone call from an ICE agent asking him to appear at ICE offices at the Bishop Henry Whipple Federal Building in Fort Snelling, Minnesota. Mr. S arrived at the ICE office a few hours after the call, at which point he was taken into ICE custody. Pet. ¶¶ 41–42; Form I-213 at 2, Dkt. 16-6. That same afternoon, ICE officials served Mr. S with a copy of a Notice of Revocation of Release ("OSUP Revocation"), thereby revoking his 2006 Order of Supervision. OSUP Revocation at 1, Dkt. 16-4. This Notice advised Mr. S that his "release has been revoked pursuant to 8 C.F.R. § 241.13(i)" because his "case is under review for removal to an alternate country" given the terms of his final removal order and the withholding of removal to Ivory Coast. *Id.* at 2.[3] Three days later, while Mr. S remained in custody, ICE prepared a new Form I-205 Warrant of Removal/Deportation again commanding any immigration officer of the

---

[2] The conditions include: (1) that Petitioner appear in person for identification and for deportation or removal; (2) that upon DHS's request, he appear for medical or psychiatric examination; (3) that he provide information about his nationality and other information that DHS believes appropriate; (4) that he not leave Minnesota for more than 48 hours without first notifying DHS; (5) that he report in person to the immigration authorities at the Bloomington, Minnesota, office every 90 days; (6) that he assist ICE in obtaining any necessary travel documents; (7) and others. OSUP at 1, 3.

[3] After serving Mr. S with the Notice of Revocation of Release, an ICE deportation officer conducted an informal interview with Mr. S, but Mr. S opted not to provide a written statement and refused to sign or initial the relevant agency form. OSUP Revocation at 3.

Department of Homeland Security ("DHS") to take Mr. S into custody and remove him from the United States. July 2026 I-205, Dkt. 16-5.

### C. The Petition and Procedural History

Mr. S filed his verified habeas Petition through counsel on July 22, 2026, asserting several claims. First, Petitioner claims that he is entitled to an order requiring his immediate release because he was arrested without a proper administrative warrant and his warrantless arrest did not comply with 8 U.S.C. § 1357(a)(2). Pet. ¶¶ 115–26. Second, Petitioner asserts that he is entitled to an order of immediate release because Respondents failed to comply with DHS's own regulation governing the revocation of his 2010 Order of Supervision—8 C.F.R. § 241.13(i)—when ICE agents: failed to give him pre-revocation notice; failed to adequately state the reasons for the revocation; did not revoke the order of supervision based on findings made by an appropriate official; and failed to properly conduct an informal interview. Pet. ¶¶ 127–39. Further, he claims that the improper revocation of his order of supervision violates his constitutional right to due process of law. Pet. ¶¶ 140–58. Finally, Mr. S claims that Respondents' efforts to remove him to a third country violate federal statutes and deprive him of due process of law. On this third-country-removal claim, Mr. S seeks an injunction prohibiting Respondents from removing him to certain third countries unless they first provide him sufficient notice and an opportunity to be heard on any fear-based claims concerning removal there. Pet. ¶¶ 159–79.

On July 24, 2026, Respondents notified the Court and opposing counsel that DHS intended to remove Mr. S from the United States in the immediate future. Dkt. 7. The Court temporarily enjoined Mr. S's removal from the United States later that day and required

the parties to discuss a briefing schedule for a ruling on Petitioner's forthcoming motion for a TRO. TRO, Dkt. 9. Petitioner filed his TRO motion on July 27, 2026, Mot. for TRO, Dkt. 12, and Respondents filed a combined response to that motion and to the merits of the Petition on August 3, 2026, Resp., Dkt. 15.

## II. THIRD-COUNTRY-REMOVAL LEGAL FRAMEWORK

### A. Removal Proceedings

The government ordinarily removes noncitizens from the United States through removal proceedings that take place before an immigration judge. 8 U.S.C. § 1229a. Among other powers, the IJ has the authority to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." *Id.* § 1229a(b)(1); 8 C.F.R. § 1240.10(a). The noncitizen may be represented by counsel, receives a reasonable opportunity to review the evidence against him, can present evidence on his own behalf, and may cross-examine the government's witnesses. 8 U.S.C. § 1229a(b)(4). Based on these procedures, the IJ determines whether the noncitizen is subject to removal under the nation's immigration laws and, if so, the location to which the noncitizen will be removed. 8 U.S.C. § 1231(b)(2); 8 C.F.R. § 1240.10(f).

Regarding the country of removal, the Immigration and Nationality Act ("INA") provides first that the noncitizen be sent to the country he designates. 8 U.S.C. § 1231(b)(2)(A); 8 C.F.R. § 1240.10(f). If the individual does not designate a country of removal, the IJ must select among other possible destinations. 8 U.S.C. § 1231(b)(2)(D); 8 C.F.R. § 1240.10(f). A noncitizen in removal proceedings is notified on the record of the destinations to which removal may be made. 8 C.F.R. § 1240.10(f) ("The immigration

judge shall also identify for the record a country, or countries in the alternative, to which the alien's removal may be made pursuant to [8 U.S.C. § 1231(b)(2)] of the [INA] if the country of the alien's designation will not accept him or her into its territory[.]").

When the IJ decides among alternative countries of removal, the first choice will be to remove him "to a country of which the alien is a subject, national, or citizen," unless that country will not accept the individual or fails to advise the immigration authorities whether it will accept him. 8 U.S.C. § 1231(b)(2)(D). Next, if the individual cannot be removed to that destination, the IJ will select from other alternative removal countries depending on the person's connections to them, such as the country from which the person was admitted to the United States or the country where the individual was born. 8 U.S.C. § 1231(b)(2)(E)(i)–(vi). Finally, "[i]f [it is] impracticable, inadvisable, or impossible" to remove an alien to a country to which the person has some connection, the IJ can order removal to "another country whose government will accept the alien into that country." 8 U.S.C. § 1231(b)(2)(E)(vii). See also *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 341 (2005) (identifying the four progressive "removal commands" set forth in 8 U.S.C. § 1231(b)(2)).

### B. Protection from Removal

Federal immigration law includes several provisions that can restrict the countries to which a noncitizen may be removed. An alien may seek protection from removal under the regulations that outline our nation's obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). S. Treaty Doc. No. 20, 100th Cong., 2d Sess. (1988), 1465 U.N.T.S. 85; *see also*

Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, Div. G, § 2242(a)–(b) (stating that it is the policy of the United States not to return a person involuntarily to a country where the person would be in danger of being subjected to torture and requiring implementation of regulations to fulfill obligations under CAT). Federal law expressly prohibits DHS from "remov[ing] an alien to a country if the [DHS Secretary[4]] decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

During removal proceedings, a noncitizen is entitled to request asylum, withholding of removal, and CAT protections. 8 C.F.R. § 1240.11(c)(1). Some of these protections are discretionary, but others are mandatory. Withholding of removal is one of the mandatory protections that prevents deportation to a country or countries where an IJ finds that the person is more than likely to be persecuted. 8 U.S.C. § 1231(b)(3)(A). CAT protection is also a mandatory protection against removal to a country where the IJ finds that the individual is likely to be tortured. *Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013) (explaining that immigration authorities have "no discretion to deny relief to a noncitizen who establishes his eligibility" for CAT protection).

IJ identification of a country or alternative countries of removal in a removal order "does not limit the authority of [DHS] to remove the alien to any other country as permitted

---

[4] Section 1231 formerly vested authority in the Attorney General, but that power is now exercised by the Secretary of the Department of Homeland Security. *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 338 n.1 (2005).

by [§ 1231(b)].” 8 C.F.R. § 1240.12(d). And DHS is not prohibited “from removing an alien to a third country other than the country to which removal has been withheld or deferred” under withholding-of-removal proceedings. 8 C.F.R. § 1208.16(f). Thus, even when a person has demonstrated that he should not be removed to a specific country and obtains relief in the form of withholding of removal to that country under CAT, he “still ‘may be removed at any time to another country where he or she is not likely to be tortured.’” *Nasrallah v. Barr*, 590 U.S. 573, 582 (2020) (citing 8 C.F.R. §§ 1208.17(b)(2), 1208.16(f)).

**C. Third-Country Removal and Petitioner**

Two developments in the first half of 2025 impact the third-country-removal issues in this case. In February of 2025, DHS issued a policy directive instructing the Enforcement and Removal Operations division of ICE to review the cases of noncitizens granted withholding of removal or protection under the CAT “to determine the viability of removal to a third country and accordingly whether the alien should be re-detained.” February 18, 2025 DHS Policy Directive on Expedited Removal and Nondetained Docket (Feb. 18, 2025), https://perma.cc/T8TV-GT84; *see also D.V.D. v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355, 367 (D. Mass. 2025) [hereinafter *D.V.D. I*]. According to the February policy directive, the impetus for this reexamination was, in part, that the government had achieved “significant gains with regard to previously recalcitrant countries and the potential for third country removals.” *See D.V.D. I*, 778 F. Supp. 3d at 367 (quoting the February policy directive).

Then, on March 30, 2025 former DHS Secretary Kristi Noem issued a memorandum entitled *Guidance Regarding Third Country Removals* (Mar. 30, 2025) (hereafter "March 2025 Guidance").[5] According to the March 2025 Guidance, before a noncitizen is removed to a country that has not previously been identified as the country to which he will be removed, "DHS must determine whether that country has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured," and if DHS has such assurances, the noncitizen may be removed without any additional procedures. March 2025 Guidance at 1–2. If the third-country destination has not provided credible assurances, then DHS will provide the noncitizen with a notice of removal to that country but will not ask whether the alien is afraid of being removed there. If he nonetheless expresses such a fear, DHS will refer him to U.S. Citizenship and Immigration Services ("USCIS") for a screening for eligibility for protection under the Immigration and Nationality Act and the Convention Against Torture. *Id.* at 2. If the USCIS officer conducting the screening does not believe that the noncitizen is likely to be persecuted based on a statutorily protected ground or tortured in the alternative country under consideration, then the individual will be removed there. *Id.* If a USCIS officer determines that the individual is likely to be persecuted or tortured in the removal country, ICE will be notified by USCIS and may file a motion to reopen the proceedings or elect to designate another country for removal. *Id.*

[5] A copy of the March 2025 Guidance is not included in the record. However, Respondents provided the following link to a copy of the document online: https://immigrationlitigation.org/wp-content/uploads/2025/04/43-1-Exh-A-Guidance.pdf (last visited September 3, 2026).

On July 9, 2025, ICE issued further guidance (hereafter "July 2025 Guidance") on how to implement DHS's March 2025 Guidance. Pet. ¶ 50.[6] The July 2025 Guidance is identical to the March 2025 Guidance except that, in cases where diplomatic assurances from the destination country do not exist, it instructs immigration agents to serve a "Notice of Removal" that identifies the removal country and translates the notice for the noncitizen. *See id.* It further provides that DHS may remove the individual within 24 hours after the notice has been served, though in undefined "exigent circumstances," DHS can execute removal to a third country within 6 hours of serving the notice. *Id.* ¶ 51. See also *Esmaeili v. Noem*, No. 26-CV-0203-GPC-JLB, 2026 WL 240661, at *6 (S.D. Cal. Jan. 29, 2026) (discussing the July 2025 Guidance).

As discussed, Mr. S's 2006 removal order granted him withholding of removal with respect to Ivory Coast. But it also states that he could be removed to any country other than Ivory Coast. Respondents have now indicated they intend to remove him Sierra Leone. In a declaration dated July 27, 2026, Vu Cam, an ICE official,[7] states that Sierra Leone "has entered into an arrangement with the Department of State to accept certain aliens under final orders of removal from the United States." Cam Decl. ¶ 4, Dkt. 17. Mr. Cam further explains that Sierra Leone "has accepted the Petitioner for third-country removal" and

---

[6] A copy of the July 2025 Guidance is available at https://storage.courtlistener.com/recap/gov.uscourts.mad.282404/gov.uscourts.mad.282404.190.1.pdf (last visited September 3, 2026).

[7] Vu Cam's full title is "Acting Unit Chief (UC), Removal Management Division (RMD), RIO (Removal International Operations), Africa, Enforcement and Removal Operations (ERO), U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (DHS)." Cam Decl. at 1, Dkt. 17.

"provided diplomatic assurances that aliens removed from the United States . . . will not be subjected to persecution or torture in Sierra Leone." *Id.* ¶¶ 5–6. The United States Department of State "determined that these diplomatic assurances were credible and reliable." *Id.* ¶ 6. ICE scheduled Mr. S's removal to Sierra Leone on July 30, 2026, but could not follow through with the removal at that time because the Court had entered a temporary restraining order enjoining his removal until the Court could issue a ruling on Petitioner's TRO motion. *Id.* ¶¶ 7–8. According to Mr. Cam, in effecting Petitioner's removal from the United States, ICE intends to follow the March 2025 Guidance. *Id.* ¶ 9.

## III. DISCUSSION

The Petitioner's claims can sensibly be lumped into three categories: (1) a challenge to the Respondents' revocation of his order of supervision; (2) a challenge to the procedures ICE used to take him into custody; and (3) a challenge to the procedures the government used and plans to use to determine whether he can be removed to Sierra Leone or another alternative country. As discussed below, the Court finds Mr. S is not entitled to habeas relief on his OSUP-revocation or unlawful-arrest claims, but he is entitled to relief on his third-country-removal claim.

### A. Habeas Corpus Standard

Under 28 U.S.C. § 2241, the Court may grant a writ of habeas corpus for a petitioner who is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). The right to challenge the legality of a person's confinement through a habeas petition extends to case involving immigration-related detention. *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001); *Deng Chol A. v. Barr*, 455 F. Supp. 3d 896,

900–01 (D. Minn. 2020). The petitioner has the burden to prove that his detention is illegal by a preponderance of the evidence. *Jose J.O.E. v. Bondi*, 797 F. Supp. 3d 957, 965 (D. Minn. 2025).

The extent of federal courts' jurisdiction to hear habeas claims is traditionally to obtain "release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). However, "immediate physical release [is not] the only remedy under the federal writ of habeas corpus." *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025) (per curiam) (quoting *Peyton v. Rowe*, 391 U.S. 54, 67 (1968)). In some circumstances, a district court presiding over a habeas case has the authority to hear a claim seeking an injunction against removal if that claim presents a pure question of law. *Jama v. Immigration and Naturalization Serv.*, 329 F.3d 630, 632 (8th Cir. 2003).

**B. The OSUP-Revocation Claim**

The Court begins with Petitioner's claim that the revocation of his order of supervision failed to comply with the procedures established in the applicable regulations and, therefore, violated his procedural due process rights. Specifically, he contends that Respondents did not follow the requirements of 8 C.F.R. § 241.13(i) when they decided to revoke his OSUP.

As the Supreme Court held in *Zadvydas*, the government cannot detain a noncitizen indefinitely when it is unable to remove him from the United States. 533 U.S. at 699–700. Federal regulations provide that ICE must release an individual ordered removed when there is no significant likelihood of removal in the reasonably foreseeable future. 8 C.F.R. § 241.13(g)–(h). When ICE releases a person on an OSUP, its "ability to re-detain that

noncitizen is constrained" by § 241.13(i). *Roble v. Bondi*, 803 F. Supp. 3d 766, 771 (D. Minn. 2025). Because there is no evidence Mr. S violated any of the conditions of release, 8 C.F.R. § 241.13(i)(1) does not apply here, and the relevant provision is 8 C.F.R. § 241.13(i)(2), which governs revocation and re-detention for the purposes of removal. Paragraph (i)(2) states that DHS "may revoke an alien's release under this section and return the alien to custody if, on account of changed circumstances, the Service determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2).

The regulation further provides that "[u]pon revocation, the alien will be notified of the reasons for revocation of his or her release," and DHS "will conduct an initial informal interview promptly after his or her return to … custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. § 241.13(i)(3). And the noncitizen is allowed to provide "any evidence or information that he or she believes shows there is no significant likelihood he or she [will] be removed in the reasonably foreseeable future[.]" *Id.*; *see also Roble*, 803 F. Supp. 3d at 771 (discussing the requirements of 8 C.F.R. § 241.13(i)(2), (3)).

Petitioner focuses on the timing of when Respondents provided him notice that his OSUP was revoked, arguing that ICE violated the regulation because the notice was not issued and served before he was arrested. Reply, Dkt. 18 at 27–28 ("Respondents only revoked Petitioner's release after he was detained. … Where Petitioner was detained first, then served his revocation of release after, Respondents have failed to strictly follow the procedures outlined in § 241.13.") (cleaned up). The Court disagrees.

The record evidence shows that Mr. S received notice of the revocation on the same day he was taken into ICE custody. OSUP Revocation at 2 (Proof of Service); Form I-213 at 2 (noting July 16, 2026 date of arrest). Also on that day, ICE conducted an initial informal interview, but Mr. S elected not to write a statement and refused to sign or initial the document. OSUP Revocation at 3; Dkt. 16 ¶ 10. This meets the requirements of 8 C.F.R. § 241.13(i)(3). *Abraham M. v. Mullin*, No. 26-cv-2609 (LMP/DJF), 2026 WL 1864079, at *3 (D. Minn. June 29, 2026); *Somvang P. v. Sec'y, Dep't of Homeland Sec.*, No. 26-cv-37 (PJS/EMB), 2026 WL 788853, at *2 (D. Minn. Mar. 20, 2026). The regulation does not expressly state that the notice of the revocation must be served on a noncitizen *before* he is "return[ed] to custody." 8 C.F.R. § 241.13(i)(2). It only states that he will be notified of the reasons for the revocation "upon revocation." 8 C.F.R. § 241.13(i)(3).

Mr. S's petition also alleges other bases for claiming that Respondents failed to comply with the 8 C.F.R. § 241.13(i)(3)'s requirements. He contends: (1) he was not provided a sufficient statement of the specific reason or reasons that his OSUP was revoked; (2) Respondents' statement that his case is under review for removal to an alternate third country fails to provide evidence that his removal was reasonably foreseeable; (3) there is no evidence that a designated official made findings in support of the OSUP revocation; and (4) Respondents did not properly conduct an informal interview because it occurred too soon after he received notice of the revocation. Pet. ¶¶ 133–36. However, none of these claims entitle Mr. S to release from custody. The informal interview he was offered complied with the regulation. *See Abraham M.*, 2026 WL 1864079, at *4 (rejecting claim that informal interview conducted the same day as arrest

violated § 241.13(i)(3)). The notice provided a sufficient statement of the reason for revocation when it explained that his case was under review for removal to an alternate country. OSUP Revocation. And the record reflects that efforts to remove him to Sierra Leone were well underway before this case was filed. Cam Decl. ¶¶ 6–8. Finally, Petitioner has failed to show that the Assistant Field Office Director who signed Petitioner's notice of revocation was not an appropriate official to revoke his OSUP. *See Foloshade O. v. Schilling*, No. 26-cv-2705 (LMP/DTS), 2026 WL 1734877, at *3 (D. Minn. June 16, 2026) (rejecting a similar claim).

Because the record supports a conclusion that Respondents complied with the regulation, and Mr. S has not demonstrated it is more likely than not they failed to do so, the Court finds he is not entitled to a writ of habeas corpus on his OSUP-revocation claim.

**C. The Unlawful-Arrest Claim**

Next, the Court addresses Petitioner's claim that he should be released because he was arrested without a valid warrant. Mr. S argues: (1) Respondents could not justify his arrest based on the October 2006 I-205 Warrant of Removal; (2) the 2026 I-205 was not *issued* until after he had already been taken into custody; and (3) the circumstances of his arrest do not support a warrantless arrest under 8 U.S.C. § 1357(a)(2). Reply at 21–25. Because the Court concludes that Petitioner's arrest was justified based on the October 2006 I-205, the Court denies his petition on this basis.

As an initial matter, the Court acknowledges that this conclusion contradicts those reached in two prior cases where habeas petitioners had been arrested based on I-205 warrants of removal that were many years old. *Ger V. v. Mullin*, No. 26-cv-2543

(KMM/DTS), 2026 WL 1847044 (D. Minn. June 26, 2026); *Ahmed S. v. Blanche*, No. 26-cv-2265 (KMM/DLM), 2026 WL 1998718 (D. Minn. July 10, 2026). In both of these cases, the undersigned questioned the propriety of immigration authorities using an old I-205 to justify the new arrest of noncitizens who had been ordered removed many years before, who could not be removed from the United States at the time of those orders, and who were out of custody on orders of supervision when they were taken back into custody. However, after deciding *Ger V.* and *Ahmed S.*, this Court developed concerns about whether the age of an I-205 in fact renders it legally too stale to support an arrest many years later. *See, e.g.*, *Chao Y. v. Mullin*, No. 26-cv-3201 (KMM/ECW), Dkt. 8 at 3 (D. Minn. July 31, 2026) ("Respondents here have pointed to caselaw, regulations, and assertions about the mechanics of executing I-205 warrants that may call into question the validity of this Court's observations in *Ger V.* and *Ahmed S.*"). The Court must revisit this issue, and now finds that it cannot agree with its statements in *Ger V.* and *Ahmed S.* that the government cannot make an arrest based on an I-205 warrant simply because it was issued many years ago.

The Court does not change course lightly. Indeed, the Court has carefully considered the language of the relevant regulations and finds that they do not support the conclusion that an I-205 necessarily expires because it is older, nor that the government is always required to obtain a new warrant when an I-205 was never fully executed because the individual was not removed from the United States. DHS regulations require the issuance of a Form I-205 Warrant of Removal for a noncitizen subject to an administratively final removal order. 8 C.F.R. § 241.2(a) ("A Form I-205, Warrant of Removal, based on the final

administrative removal order in the alien's case will be issued by any of [a specified list of] immigration officials[.]"). The regulations require immigration authorities to take an alien into custody "pursuant to the warrant of removal" when the removal period begins. 8 C.F.R. § 241.3(a). However, the statutory provisions governing detention beyond the removal period do not speak of any administrative warrant requirement, and the applicable regulations also do not mandate the issuance of a new warrant of removal to return a person to the custody of DHS because he has either violated the conditions of release in his OSUP or because circumstances have changed making his removal once again reasonably foreseeable.

DHS regulations provide only that a Form I-205 Warrant of Removal "will be issued" in the case of an alien who has an administratively final order of removal, 8 C.F.R. § 241.2(a), and that an alien who has been ordered removed "will be taken into custody pursuant to the warrant of removal" when "the removal period . . . begins," 8 C.F.R. § 241.3(a). At the same time, DHS regulations simply state that when a noncitizen has violated the conditions of release in the order of supervision he "may be returned to custody," 8 C.F.R. § 241.13(i)(1), and DHS may revoke his release "and return the alien to custody" when circumstances have changed such that a removal once thought unlikely is now reasonably foreseeable, 8 C.F.R. § 241.13(i)(2). In neither of these circumstances is the "removal period" beginning. *See* 8 C.F.R. § 241.3(a). The regulations do not elsewhere equate re-detention based on the revocation of release under § 241.13(i) with the start of the removal period, nor do they discuss any requirement that a new warrant of removal accompany that revocation.

With that regulatory backdrop in mind, the undersigned finds persuasive the thorough and well-reasoned opinion of her colleague in *Pao M. v. Blanche*, 26-cv-3399 (LMP/DJF), 2026 WL 2454331 (D. Minn. Aug. 21, 2006). There, United States District Judge Laura M. Provinzino concluded that "an I-205 warrant of removal remains effective if the subject of the warrant is arrested but not removed from the country." *Id.* at *3. In reaching that conclusion, Judge Provinzino observed that the statutes and regulations do not "speak[] to the expiration date of an I-205 warrant of removal," but looked to "baseline principles of criminal procedure" for guidance on the issue of when the I-205 warrant is executed. *Id.* at *2. Judge Provinzino further explained, based on caselaw from the Eighth Circuit and others, that the "purpose of a warrant of removal is to effectuate and document the noncitizen's removal from the United States," which is "not fulfilled until it memorializes the noncitizen's removal." *Id.* at *2–3 (cleaned up). Finally, Judge Provinzino found that the structure of the I-205 warrant and longstanding agency guidance supports the conclusion that an "I-205 warrant is executed when removal is complete." *Id.* at *3.

Having carefully reviewed the applicable statutes and regulations, the persuasive discussion in *Pao M.*, and the cases on which *Pao M.* relies, this Court agrees with the analysis in *Pao M.* and concludes that its own statements to the contrary in *Ger V.* and *Ahmed S.* were incorrect. Accordingly, the Court concludes that Petitioner's arrest was not unlawful based on the age of the October 2006 I-205. Instead, the Court finds that the 2006 warrant was never fully executed because Mr. S's removal was never completed. It is undisputed that Mr. S was arrested in 2006 but never removed, and since it wasn't executed at that time, it remains valid. Because Respondents "had a valid administrative warrant in

hand at the time of [Petitioner's] arrest, his arrest was lawful." *Pao M.*, 2026 WL 2454331, at *3 (quotation omitted).

**D. Third-Country-Removal Claim**

Petitioner's remaining claim is that the government's efforts to remove him to a third country—Sierra Leone—violate his statutory and due process rights because he has been deprived of an opportunity to present any claim that he faces a likelihood of torture or persecution if removed there. Pet. ¶¶ 159–79. Before turning to the merits of this claim, the Court first addresses Respondents' arguments that the Court lacks jurisdiction.

**1. Jurisdiction – The *D.V.D.* Class Action**

Respondents argue that the Court lacks jurisdiction over Mr. S's third-country-removal claim because he is a member of the nationwide class challenging the procedures for third-country removal in the *D.V.D.* litigation. Some background on the history of that case provides needed context.

In *D.V.D. v. Department of Homeland Security*, the United States District Court for the District of Massachusetts entered a temporary restraining order in March 2025 enjoining ICE from removing a noncitizen subject to a final removal order to a third country unless certain procedural protections were satisfied. *D.V.D. I*, 778 F. Supp. 3d at 368. Then, in April 2025, the district court certified a plaintiff class and issued a class-wide preliminary injunction establishing procedures that DHS and ICE had to follow before removing citizens to a third country. *Id.* at 394. In June 2025, the United States Supreme Court stayed the preliminary injunction in *Department of Homeland Security v. D.V.D.*, 145 S. Ct. 2153 (2025) [hereinafter *D.V.D. II*]. Following the Supreme Court's stay of the

injunction, the *D.V.D.* plaintiffs asked the First Circuit to remand the case to the district court to allow it to dissolve the preliminary injunction and allow the district court's case to proceed to a judgment. *D.V.D. v. Dep't of Homeland Sec.*, Nos. 25-1393, 24-1631, 2026 WL 1102937, at *1 (1st Cir. Feb. 20, 2026) [hereinafter *D.V.D. III*]. The First Circuit agreed and remanded the case for dissolution of the preliminary injunction. *Id.*

Following remand, on February 25, 2026, the district court granted the plaintiffs' motion for summary judgment. *D.V.D. v. Dep't of Homeland Sec.*, 821 F. Supp. 3d 102, 167–68 (D. Mass. 2026) [hereinafter *D.V.D. IV*]. The court provided the plaintiffs several forms of declaratory relief, including: requiring the government to provide meaningful notice before removal to any third country; requiring the government to provide an opportunity to raise a country-specific claim against removal before removal to a third country; and setting aside the government's third-country-removal policy as reflected in the March 2025 Guidance and subsequent iterations of that same policy. *Id.* The government appealed that decision, and on March 16, 2026, the First Circuit granted the government's emergency motion for a stay of the district court's judgment pending completion of the appeal. *D.V.D. v. Dep't of Homeland Sec.*, No. 26-1212 (1st Cir. Mar. 16, 2026) (Order). The appeal in *D.V.D.* has been fully briefed and argued, but it has not yet been decided. Thus, the *D.V.D.* litigation has not yet been fully resolved, and the class-wide relief ordered by the district court in *D.V.D. IV* remains on hold until further action by the First Circuit.

Respondents argue that because Petitioner is a member of the *D.V.D.* class, the Court lacks jurisdiction over his claims here by operation of Rule 23(b)(2), the first-to-file rule,

and res judicata. For several reasons, the Court rejects these arguments. First, Respondents do not point to any binding authority that treats any of the rules they invoke as a limitation on the Court's subject matter jurisdiction. Nor does it appear that they could. The first-to-file rule allows a court to "decline jurisdiction" as a matter of federal comity to "promote efficient use of judicial resources." *Orthmann v. Apple River Campground*, 765 F.2d 119, 121 (8th Cir. 1985); *Siruk v. Robinhood Fin.*, No. 21-cv-0415 (PJS/DTS), 2021 WL 1997252, at *1 (D. Minn. Mar. 31, 2021) (explaining that the "first-to-file rule is a prudential doctrine that grew out of the need to manage overlapping litigation across multiple districts"), *report and recommendation adopted sub nom. In re January 2021 Short Squeeze Trading Litig.*, No. 21-2989-MDL-ALTONGA/Torres, 2021 WL 1997091 (S.D. Fla. May 4, 2021). Its application is discretionary. *N.W. Airlines Inc. v. Am. Airlines*, 989 F.2d 1002, 1005 (8th Cir. 1993). Res judicata "is an affirmative defense that, while having a somewhat jurisdictional character, does not affect the subject matter jurisdiction of a district court." *Kursar v. Trasnp. Sec. Admin.*, 751 F. Supp. 2d 154, 163 (D.D.C. 2010) (cleaned up).

Second, in invoking these rules, Respondents ignore the procedural posture in which the *D.V.D.* litigation now sits—the *D.V.D.* plaintiffs obtained certain relief from the district court, but the merits of the district court's decision remain pending on appeal, and the relief itself currently has no effect. Therefore, it is "counterintuitive that non-opt-out class membership, for the purpose of granting [an] injunction to prevent removal without due process, could prevent individuals from making their own claims for due process while that

injunction is stayed on a class-wide basis." *Sagastizado v. Noem*, 802 F. Supp. 3d 992, 1008 (S.D. Tex. 2025).

Relatedly, Respondents' suggestion that Mr. S's membership in the *D.V.D.* class precludes his advancement of an individual claim in this case is inconsistent with the position that it has taken in the *D.V.D.* litigation. "[T]he government is arguing in *D.V.D.* that injunctive relief cannot be granted to the class, and may only be pursued (if at all) through individual cases, while arguing here that Petitioner's individual claim should be barred because his injunctive claims should be adjudicated as part of the *D.V.D.* class." *Nguyen v. Scott*, 796 F. Supp. 3d 703, 730 (W.D. Wash. 2025). Even if the Court were to ignore this inconsistency, agreeing with Respondents would mean that "by the time the issues of class-wide relief are resolved in *D.V.D.*, [Petitioner] could be removed or subjected to further due process violations under the third country removal policy." *Kumar v. Wamsley*, 817 F. Supp. 3d 1059, 1072 (W.D. Wash. 2025). Like the *Kumar* court, this Court "declines to exercise its discretion as to render [Petitioner] without a remedy to enforce his due process rights." *Id.*

Finally, Respondents suggest that the Supreme Court's decision to side with the government's request for a stay of the preliminary injunction in *D.V.D. II* "makes it clear that the [March 2025] Guidance comports with the Due Process Clause." Resp. at 11 n.1. This Court is not convinced that is the effect or the import of the Supreme Court's emergency stay ruling in *D.V.D. II*. Given that the Supreme Court issued its decision to stay the injunction "without any explanation of its reasoning," "it is unclear why the Court determined a stay should be granted or which argument [the government advanced] it found

likely to prevail on appeal." *Nguyen*, 796 F. Supp. 3d at 731–32. It is especially difficult to find that the Court's emergency stay ruling in *D.V.D. II* was based on the government's due process argument when the government "principally raise[d] a bevy of jurisdictional objections" to the injunction and one of its "primary arguments" was that the district court "had no power to enter classwide injunctive relief." *Id.* at 732. (cleaned up). If the Supreme Court agreed with those arguments rather than the government's position on the merits of the *D.V.D.* plaintiffs' substantive claims, then its decision on the emergency stay "would have no bearing on the merits of individual habeas petitions" like the one Petitioner has filed in this case. *Id.*

For these reasons, the Court concludes that Petitioner's membership in the *D.V.D.* class does not deprive the Court of jurisdiction, nor does it support the exercise of discretion to decline to exercise that jurisdiction in this case.

**2. Jurisdiction Stripping Provisions**

Respondents also suggest that the Court lacks jurisdiction over Petitioner's third-country-removal claim because Congress has stripped district courts of jurisdiction to review the execution of final orders of removal through 8 U.S.C. § 1252(g):

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by [DHS] to commence proceedings, adjudicate cases, or *execute removal orders* against any alien under this chapter.

8 U.S.C. § 1252(g) (emphasis added). Facially, it could appear that this statute deprives the court of jurisdiction because the Petitioner's request for an injunction preventing his removal to Sierra Leone would be a cause or claim on behalf of Petitioner that arises from DHS's decision to execute his removal order. *See Silva v. United States*, 866 F.3d 938, 940 (8th Cir. 2017) ("A claim that is connected directly and immediately to a decision to execute a removal order arises from that decision.") (quotation omitted).

However, even for a claim that arises from the decision to execute a removal order, the Eighth Circuit has held that § 1252(g) does not deprive the Court of jurisdiction over a habeas claim that presents a "purely legal question." *Jama v. Immigration and Naturalization Serv.*, 329 F.3d 630, 632 (8th Cir. 2003). In *Jama*, the petitioner sought to enjoin his removal to Somalia because that country had no functioning government and argued that the government's efforts to remove him there anyway rested on an incorrect interpretation of its removal authority under 8 U.S.C. § 1231(b)(2)(E)(iv). *Id.* The Eighth Circuit effectively carved out an "exception from § 1252(g)'s jurisdictional bar for a habeas claim presenting only 'a purely legal question.'" *Ali v. Sessions*, No. 17-cv-5334 (PJS/KMM), 2017 WL 6205789, at *4 (D. Minn. Dec. 7, 2017) (quoting *Jama*, 329 F.3d at 632). And after *Jama* was decided, the "Eighth Circuit signaled the continued viability of the *Jama* carve-out … in *Silva*." *Id.* at *5 (concluding that "[i]n light of *Silva*, this Court is

bound to find that § 1252(g) does not deprive it of jurisdiction over a habeas claim that raises a pure question of law") (quotation omitted).[8]

Respondents do not dispute that *Jama* is still the law in the Eighth Circuit, but they argue that here "there are only questions of fact," including "whether or not Respondents are required to provide a fear-based interview for removal to Sierra Leone." Resp. at 29–30. But Respondents do not elaborate on why that determination even involves a question of fact, let alone constitutes solely a fact issue. Even in Respondents' framing of the relevant question is correct, a determination of what they are or are not *required* to do when removing a person to an alternate country asks what the law demands of them. Contrary to Respondents' suggestion, Petitioner's "due process claim [related to third-country removal] does not require the Court to evaluate anything about [his] particular factual circumstances, but rather asks whether, as a matter of law, the Government's procedural protections provided to noncitizens being removed to a third country comport with the Due Process Clause." *See Folashade O. v. Schilling*, No. 26-cv-2705 (LMP/DTS), 2026 WL 1734877, at *4 n.10 (D. Minn. June 16, 2026). The Court concludes that Mr. S's claim that he is entitled to greater process in connection with the government's efforts to remove him to Sierra Leone (or another alternate removal country) presents the kind of pure question of law that falls within *Jama*'s exception to 8 U.S.C. § 1252(g)'s withdrawal of jurisdiction.

---

[8] This Court shares several of the concerns expressed by its colleague in *Ali* about the challenges in squaring the carve-out in *Jama* with subsequent developments in the law, including the REAL ID Act's amendments to 8 U.S.C. § 1252(g). But like the *Ali* court, this Court concludes it is bound by *Jama* in light of the Eighth Circuit's decision in *Silva*. *See Ali*, 2017 WL 6205789, at *3–5.

### 3. Merits

Mr. S argues that the procedures related to third-country removal set forth in the March 2025 Guidance and the July 2025 Guidance deprive him of due process of law. He is far from the first noncitizen to bring such a claim, and "courts around the country have determined that the procedures currently provided by the Government to noncitizens like [Mr. S] to challenge their removal to a third country on fear-based grounds are constitutionally inadequate." *Folashade O.*, 2026 WL 1734877, at *4 (collecting cases). The Court agrees that Respondents' third-country-removal policy set forth in the March 2025 Guidance and the July 2025 guidance fail to provide Mr. S the notice and opportunity to be heard that due process requires.

"[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693. And it is "well established" that noncitizens are entitled "to due process of law in the context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (per curiam) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). The minimum requirements of due process demand "that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Kumar*, 817 F. Supp. 3d at 1068 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 399 U.S. 306, 313 (1950)). Exactly what process is due "is not a technical conception with fixed content unrelated to time, place and circumstances"; rather "[i]t calls for such procedural protections as the particular situation demands." *Sagastizado*, 802 F. Supp. 3d at 1012 (cleaned up).

"Procedural due process rules are meant to protect persons … from the mistaken or unjustified deprivation of life, liberty or property," and "the right to procedural due process is absolute in the sense that it does not depend upon the merits of a claimant's substantive assertions." *Hamdi v. Rumsfeld*, 542 U.S. 507, 530 (2004) (quoting *Carey v. Piphus*, 435 U.S. 247, 259, 266 (1978)) (cleaned up). The test for determining whether the process provided in a given situation is sufficient is derived from *Mathews v. Eldridge*, 424 U.S. 310, 335 (1976). Under that framework, a court "must balance: first, the private interest that will be affected by the official action; second, the Government's interest; and third; the risk of erroneous deprivation of the private interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards." *Michelson v. County of Ramsey*, 823 F.3d 918, 924 (8th Cir. 2016) (cleaned up). The balance in this case weighs decidedly in Petitioner's favor.

Mr. S has a weighty liberty interest in avoiding removal to a country where he is more likely than not to be subject to persecution or torture. Indeed, under federal law, "a noncitizen cannot be removed to a country where his life or freedom would be threatened on account of a protected characteristic unless one of several narrow exceptions apply." *Sagastizado*, 802 F. Supp. 3d at 1009 (citing 8 U.S.C. § 1231(b)(3)); *Kumar*, 817 F. Supp. 3d at 1068–69 ("It is beyond dispute that removal to a country where an individual is likely to experience persecution or torture is a substantial deprivation of liberty."). That is so because "[w]ithholding of removal is … a mandatory protection for noncitizens who demonstrate that they meet its criteria rather than a discretionary grant." *Sagastizado*, 802 F. Supp. 3d at 1009.

This interest is further underscored by the fact that, during removal proceedings under 8 U.S.C. § 1229a, federal regulations require IJs to review any negative determination by USCIS of a noncitizen's reasonable-fear claim regarding a potential removal destination. 8 C.F.R. § 1208.31(g). While this regulation facially applies to removal proceedings and does not refer to a noncitizen who, like Mr. S, has already been ordered removed, they "are still pertinent to the inquiry into [Petitioner's] procedural entitlement to due process." *Sagastizado*, 802 F. Supp. 3d at 1009. The governing regulations allow DHS "to remove the alien to any other country as permitted by [§ 1231(b)]" when it is "unable to remove the alien to the specified or alternative country or countries" identified in the removal order. 8 C.F.R. § 1240.12(d). But while DHS regulations give the government "discretion to designate a country of removal outside of removal proceedings," the government "must exercise that authority in the appropriate way," which "means the designation must be permitted by § 1231(b) and the exercise of discretion must comport with due process." *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1009 (W.D. Wash. 2019) (quotations omitted). "[B]ecause withholding of removal is country-specific, … if a noncitizen who has been granted withholding as to one country faces removal to an alternative country, then she must be given notice and an opportunity to request withholding of removal to *that* particular country." *Guzman Chavez v. Hott*, 940 F.3d 867, 879 (4th Cir. 2019), *rev'd on other grounds sub nom. Johnson v. Guzman Chavez*, 594 U.S. 523 (2021).

Respondents suggest that Petitioner's "liberty interest is significantly diminished" because he can end his detention immediately by acquiescing to removal to Sierra Leone.

Resp. at 33 ("[T]o be free from imprisonment, Petitioner need only ask, and the Government will allow Petitioner to enjoy the freedom from detention that Petitioner had before the illegal entry.") (cleaned up). This argument misses the mark. It does not engage at all with Petitioner's liberty interest in avoiding removal to a country where he may face persecution or torture. That is the liberty interest at stake and Respondents cannot reasonably dispute that the laws of the United States prohibit his removal to an alternate country where that risk is more likely than not. *See Sagastizado*, 802 F. Supp. 3d at 1012 (characterizing the "private interest at stake [as the petitioner's] right to have his removal withheld from a country where he is more likely than not to be persecuted").

Turning to consideration of the government's interest and the risk of erroneous deprivation without additional or alternative procedures, the Court finds that due process requires procedures that Respondents have failed to provide to Mr. S. Numerous courts have held that due process requires the government to give a noncitizen like Mr. S "sufficient notice of a country of deportation that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation." *Kumar*, 817 F. Supp. 3d at 1069 (quoting *Nguyen*, 796 F. Supp. 3d at 727); *see also Aden*, 409 F. Supp. 3d at 1009; *Sagastizado*, 802 F. Supp. 3d at 1009, *Romero v. Ladwig*, No. 25-cv-1106-JWD-EWD, 2026 WL 1146824, at *15 (M.D. La. Apr. 21, 2026), *Esmaeili v. Noem*, No. 26-CV-0203-GPC-JLB, 2026 WL 240661, at *6 (S.D. Cal. Jan. 29, 2026).

The procedures laid out in the March 2025 Guidance and the July 2025 Guidance provide no more than 24 hours' and as little as 6 hours' notice of the country of removal

when ICE designates an alternate removal country that has not provided credible diplomatic assurances to the United States that people removed there will not be persecuted or tortured. And when the United States has received such assurances, people can be removed there without further procedures or any notice. Moreover, in neither situation will ICE affirmatively ask whether an individual has a fear of being removed to that chosen destination. These procedures fall short of the notice and meaningful opportunity to be heard that due process demands and create an unreasonably high risk that an individual could be erroneously deprived of his relevant liberty interest in avoiding removal to a place where he more likely than not faces a risk of serious harm. *See Kumar*, 817 F. Supp. 3d at 1069 ("Giving 'notice roughly 24 hours before removal'—as the policy allows—'devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster.'" (quoting *A.A.R.P. v. Trump*, 605 U.S. 91, 95 (2025)). They fail to strike a proper "balance between securing the removal of inadmissible aliens and ensuring their humane treatment." *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335 (2005); *Najjar v. Lunch*, 630 Fed. App'x 724 (9th Cir. 2016) ("In the context of country removal designations, last minute orders of removal to a country may violate due process if an immigrant was not provided an opportunity to address his fear of persecution in that country.").

The government has a significant interest in promptly executing removal orders. *Nken v. Holder*, 556 U.S. 418, 436 (2009) (explaining that there "is always a public interest in prompt execution of removal orders" and noting that "continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings [Congress]

established"). But "there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Id.* And imposing minimal additional procedural protections to allow Petitioner an opportunity to raise a fear-based claim regarding a designated country will not be unduly burdensome for Respondents. *See Pacheco v. Baltazar*, No. 26-cv-01176-PAB, 2026 WL 1223414, at *4 (D. Colo. May 5, 2026) (finding that it would not be unduly burdensome to require, prior to a third-country removal, written notice of the removal country, followed by at least ten days in which the noncitizen has an opportunity to raise a fear-based claim, a reasonable-fear interview, and an opportunity to reopen removal proceedings); *see also Kumar*, 817 F. Supp. 3d at 1073 (finding that the process proposed by the petitioner was "proportional to the need to ensure 'a reasonable opportunity to raise and pursue his claim for withholding of deportation' or CAT protection" (quoting *Aden*, 409 F. Supp. 3d at 1009)).

For these reasons, the Court concludes that the procedures Respondents have followed and represented that they intend to follow violate Petitioner's right to due process of law under the Fifth Amendment. The Court will, therefore, enjoin Petitioner's removal to Sierra Leone (or to any other country not specifically designated in his order of removal) until Respondents provide Petitioner with meaningful notice and opportunity to assert a fear-based claim before an immigration judge.

**4. Scope of Relief**

The question, then, is what procedures are required. Petitioner requests several forms of relief to remedy the due process violation, including:

(1) Require Respondents to provide written notice of removal at least ten days prior to removal in a language that Petitioner understands;

(2) If, after inquiring whether Petitioner has a fear of removal to that third country, Petitioner expresses such a fear, then Respondents must provide a reasonable-fear interview to screen for Petitioner's fear of persecution and torture, consistent with 8 C.F.R. § 208.31;

(3) If Petitioner is found to have a reasonable fear of removal, the Respondents must move to reopen Petitioner's removal proceedings to allow Petitioner to present a full claim for relief under 8 U.S.C. § 1231(b)(3) and FARRA;

(4) If Petitioner is not found to have such a fear, then Respondents must allow for a further fifteen days for Petitioner to file a motion to reopen with the immigration court or Board of Immigration Appeals, as appropriate.

Pet. at 61–62. Other courts, including at least one in this District, have ordered similar relief in third-country-removal cases to remedy comparable due process violations. *Folashade O.*, 2026 WL 1734877, at *5; *see also Kumar*, 817 F. Supp. 3d at 1074. And the Court notes that none of this requested relief intrudes on the Executive Branch's authority to decide whether, on the merits of any fear-based claim, he is entitled to withholding of removal or asylum. Rather, it ensures that if he is denied that relief, it will only occur after Respondents have afforded Petitioner meaningful notice and an opportunity to be heard. *Kassye v. Mullin*, No. 1:26-cv-1648 (RDA/LRV), 2026 WL 1832368, at *7 (E.D. Va. June 24, 2026) ("It may well be that Petitioner is not entitled to withholding of removal [to the designated country] after engaging in the process required by statute and regulation, but at that point Respondents would have satisfied [their] obligations under the statute and the Constitution, and the Court would not second-guess that determination.").

Respondents object that the Court should not order "the requested relief of ordering Respondents to reopen removal proceedings so that Petitioner can establish a fear of

removal with an [IJ]" because the law permits removals to third countries and "there is no single regulation that would permit IJ review" under circumstances where a fear-based claim was raised after immigration proceedings have concluded. Resp. at 19–21. The Court finds this argument unpersuasive for reasons already discussed above. The question here is not simply whether there are existing statutes and regulations that specifically govern this circumstance, but whether the procedures Respondents have elected to follow comply with due process.

Moreover, to the extent Respondents object to Petitioner's request that any relief include a requirement that Respondents affirmatively move to reopen removal proceedings, the Court agrees with the *Aden* court's assessment of this issue:

> ICE's authority to remove a noncitizen to a country not specified in the immigration judge's order of removal is contingent on its compliance with § 1231(b): it therefore has an affirmative obligation to make a determination regarding a noncitizen's claim of fear before deporting him. Thus, both the due process claim and the governing statute place the burden on the government – regardless of whether the country of deportation is designated during or after the removal hearing – to provide a meaningful opportunity to be heard on asylum and withholding claims. It has not does so in this case. Giving petition an opportunity to file a motion to reopen – a motion which seeks discretionary relief that may be denied without any sort of hearing – is not an adequate substitute for the process that is due in these circumstances. The importance of an asylum or withholding applicant's testimony cannot be overstated, and requiring petitioner to make a compelling and credible showing of fear of persecution through a declaration in support of a motion to reopen is not an adequate substitute.

409 F. Supp. 3d at 1010 (quotations omitted); *see also Kumar*, 817 F. Supp. 3d at 1074 (ordering similar relief).

Further, the Court notes that in other circumstances where a noncitizen raises a potential credible fear of removal to a particular country, there is review by an immigration judge, not merely an asylum officer. *See* 8 C.F.R. § 208.30(g)(1) (requiring an asylum officer to "inquire whether the alien wishes to have an immigration judge review the negative decision, which shall include an opportunity for the alien to be heard and questioned by the immigration judge"); 8 C.F.R. § 208.31(g) (requiring an "asylum officer's negative decision regarding reasonable fear" to be reviewed by an IJ); *see also* 8 C.F.R. § 208.16(a) (providing for immigration judge review in initial withholding proceedings). Accordingly, the Court rejects Respondents' suggestion that reopening of Petitioner's immigration proceedings for further consideration of fear-based claims is unwarranted.

**E. Release from Custody**

Finally, the Court notes that it is not ordering Respondents to immediately release Mr. S from custody based on his third-country-removal claim. Petitioner appears to be subject to detention pursuant to 8 U.S.C. § 1231(a)(6), which allows DHS to detain a person beyond the removal period. Mr. S has been in custody since July 16, 2026. Under *Zadvydas*, he cannot be detained indefinitely, but given the relatively short duration of his detention in this case and the efforts Respondents have made to remove him, there is no basis for the Court to conclude, on this record, that there is no significant likelihood of removal in the reasonably foreseeable future. *See Aden*, 409 F. Supp. 3d at 1022–23 (concluding that petitioner's detention was "not indefinite within the meaning of *Zadvydas* and … he is not entitled to immediate release" where the process for seeking relief from

removal to an alternate country had not played out; noting "the fact that there is no clear end date does not mean that there is no significant likelihood of removal in the reasonably foreseeable future"); *Folashade O.*, 2026 WL 1734877, at * n.9 (observing that the petitioner could not be "detained indefinitely" and that ICE was required to conduct a custody review under 8 C.F.R § 241.4(l)(3) within three months of revoking the OSUP, "[a]nd if [the petitioner's] detention extends to six months without removal in sight, she may bring a claim pursuant to *Zadvydas*").

**ORDER**

For the reasons discussed above, **IT IS HEREBY ORDERED THAT**:

1. The Petition for a Writ of Habeas Corpus (Dkt. 1) is **GRANTED IN PART** and **DENIED IN PART** as stated in this Order.

2. Respondents are **ENJOINED** from removing Petitioner to Sierra Leone or to any country not designated on his order of removal without providing him meaningful notice and opportunity to assert a fear-based claim before an immigration judge. Specifically:

    a. Respondents must provide Petitioner with a reasonable fear interview concerning Sierra Leone if he states a fear of removal within 10 days of this Order.

    b. If Respondents determine that Petitioner states a reasonable fear of removal to Sierra Leone, then Respondents must move to reopen his removal proceedings for him to present a claim for withholding of removal or deferral of removal under the CAT to an immigration judge;

    c. If Respondents determine that Petitioner does not state a reasonable fear of removal to Sierra Leone, then Respondents must allow Petitioner 15 days to file a motion to reopen his removal proceedings before removing him.

    d. With respect to removal to any other alternate country besides Sierra Leone, Respondents must provide written notice of removal to that country at least 10 days prior to the removal and ask whether Petitioner has a fear of removal to the third country. If the Petitioner expresses such a fear, then Respondents must provide a reasonable fear interview to screen for Petitioner's fear of

persecution and torture. If Petitioner is found to have a reasonable fear of removal to that country, Respondents must move to reopen Petitioner's removal proceedings to allow Petitioner to present a claim for withholding of removal or deferral of removal under the CAT to an immigration judge. If Petitioner is found not to have such a fear, Respondents must allow an additional 15 days from such determination for Petitioner to file a motion to reopen his removal proceedings before removing him.

**Let Judgment be entered accordingly**.

Date: September 3, 2026

*s/Katherine Menendez*
Katherine Menendez
United States District Judge